TOM LOFTUS, Chairman Assembly Organization Committee
FRED A. RISSER, Chairperson Senate Organization Committee
You have asked whether Wisconsin's Unfair Sales Act, section100.30, Stats., and proposed Wisconsin Administrative Code chapter Ag 119 interpreting that statute violate the Sherman Act or constitutional due process in the treatment of cash discounts in the cigarette resale industry. In addition, the Assembly Committee on Organization asks whether the proposed rules exceed statutory authority by limiting the use of such cash discounts to reduce the distributor's cost.
Section 100.30(3) prohibits the sale of merchandise by a retailer or wholesaler at less than cost. In the cigarette resale industry, the statute defines "cost" to a wholesaler, distributor or multiple retailer in section 100.30(2)(c)1.a. and b. as follows:
 (c)1.a. With respect to the sale of cigarettes or other tobacco products, fermented malt beverages, intoxicating liquor or wine, or motor vehicle fuel, "cost to wholesaler" means, except as provided in subd. 1.b., the invoice cost of the merchandise to the wholesaler within 30 days prior to the date of sale, or the replacement cost of the merchandise to the wholesaler, whichever is lower, less all trade discounts except customary discounts for cash, plus any excise taxes imposed on the sale thereof prior to the sale at retail, and any cost incurred for transportation and any other charges not otherwise included in the invoice cost or the replacement cost of the merchandise as herein set forth, to which shall be added, except for sales at wholesale between wholesalers, a markup to cover a proportionate part of the cost of doing business, which markup, in the absence of proof of a lesser cost, shall be 3% of the cost to the wholesaler as herein set forth. *Page 164 
 b. For every person holding a permit as a distributor as defined in s. 139.30(3) or as a multiple retailer as defined in s. 139.30(8), with respect to that portion of the person's business which involves the purchase and sale of cigarettes "cost to wholesaler" means the cost charged by the cigarette manufacturer, disregarding any manufacturer's discount or any discount under s. 139.32(5), plus the amount of tax imposed under s. 139.31. Except for a sale at wholesale between wholesalers, a markup to cover a proportionate part of the cost of doing business shall be added to the cost to wholesaler. In the absence of proof of a lesser cost, this markup shall be 3% of the cost to wholesaler as set forth in this subparagraph.
The statute expressly excludes the use of cash discounts given by manufacturers in order to reduce the wholesaler's cost, and all manufacturer's discounts to reduce the distributor's cost. It goes on, in relevant part, to require a minimum markup of three percent to cover the cost of doing business, in the absence of the distributor providing proof of a lesser cost of doing business. The Department of Agriculture, Trade and Consumer Protection has proposed Wisconsin Administrative Code chapter Ag 119 as a uniform method to determine a wholesaler's cost of doing business when attempting to prove that it is less than the three percent set by the statute. Wholesalers, distributors and multiple retailers would be permitted, by proposed Wisconsin Administrative Code section Ag 119.08(2)(b) and (3)(b), to use manufacturers' cash discounts to reduce their cost of doing business, but only to the extent that the discounts "offset interest expenses and other bank charges" incurred by the seller in providing a service or item of value to the manufacturer in order to receive the cash discount.
The materials included in your request from Representative Neubauer state that all "distributors" of cigarettes for resale promptly pay manufacturers to receive a 3.25% cash discount, and that manufacturers "universally" offer this discount. Your materials do not make it clear whether this situation applies equally to distributors and multiple retailers. You also state that distributors routinely sell at less than a three percent markup because their cost of business is very low. Their interest expenses and other bank charges are minimal, resulting in the inability of distributors to use, under the proposed rule, a significant portion of cash discounts to lower their permitted cost of doing business. Your concern appears *Page 165 
to be that disallowing the use of the full cash discount to reduce a distributor's cost of doing business results in an inaccurate and artificially high cost of doing business. You state that the statute, as interpreted by the proposed rule, goes beyond the purpose of preventing sales below cost and, in effect, requires a minimum profit of about three percent, by not permitting an actual, bona fide cost reduction cash discount to be utilized.
Your first specific question is whether or not section 100.30
violates provisions of antitrust law contained in the Sherman Act and related United States Supreme Court cases. I assume the theory behind this question is that by not allowing manufacturers' cash discounts to be used to reduce costs, the statute requires wholesalers to unlawfully fix prices, in this case by guaranteeing a three percent profit.
The answer to your first question is no.
The issue of whether section 100.30 violates the Sherman Act is really a question of whether the Sherman Act, which embodies the anti-price fixing policy of Congress, preempts Wisconsin's policy against below-cost pricing contained in section 100.30. The standard for addressing this preemption question is to determine whether or not the Sherman Act and the state plan contain an irreconcilable conflict. Rice v. Norman Williams Co., 458 U.S. 654,660 (1982). If there is no irreconcilable conflict between federal antitrust policy and the state statute, even though the state scheme might have a hypothetical anticompetitive effect, the state law is not preempted. Id. at 660. If the state statute does not authorize, require or irresistibly force private conduct that in all cases violates the Sherman Act, "the statute cannot be condemned in the abstract." Id. at 662.
In applying the irreconcilable conflict standard, two state resale price maintenance statutes have recently been struck down. California's statutory scheme for wine wholesalers required that wine resale prices be fixed either by the producer through a fair trade contract dictating price or by the wholesaler through a published resale price schedule. The California statute was struck down as unlawful resale price maintenance and vertical price control by producers, in violation of the Sherman Act. Cal.Retail Liquor Dealers Ass'n v. Midcal Alum., 445 U.S. 97 (1980). *Page 166 
New York's liquor price maintenance statute was also struck down in that it caused an unlawful maintenance of retail prices at artificially high levels, in violation of the Sherman Act. 324Liquor Corp. v. Duffy, 479 U.S. 335 (1987). Although New York's scheme of statutory price maintenance was complex, the Supreme Court's focus was on the statute's permission for wholesalers to reduce case prices of liquor, while at the same time requiring the bottle retail price to be fixed at 112 percent of the bottle cost at wholesale. Wholesalers could then reduce case prices well below bottle prices, resulting in an artificially high bottle price at retail, with artificially high retail profits. The Court, relying on Midcal's emphasis on illegal vertical price control, held that the New York statute illegally mandated resale price maintenance. 324 Liquor Corp., 479 U.S. at 341-43.
The key features relied on by the Supreme Court to strike down the statutory schemes in California and New York are not present in section 100.30. It has no requirement that has the effect of permitting any single wholesaler or producer to fix prices. It does not require producers to fix prices by contract or require all wholesalers to resell at the same published price. Nor does section 100.30 authorize, require or encourage wholesalers to collude with one another to set uniform resale prices to retailers, as was present in the New York and California schemes. Section 100.30 requires each wholesaler to determine its actual cost, based upon prevailing market conditions, irrespective of other wholesaler's costs. There is no concerted action or conspiracy condemned by the Sherman Act.
The issue of whether or not section 100.30 is in violation of the prohibition against price fixing embodied in the Sherman Act has been addressed by Wisconsin courts. In State v. Eau ClaireOil Co., 35 Wis.2d 724, 733, 151 N.W.2d 634 (1967), the court agreed with another state's decision characterizing statutes which prohibit sales below cost as not of a price-fixing nature, since they "merely fixed a floor beneath which prices may not be set . . . ." In other words, section 100.30 does not require the distributor to sell at a state-determined price, but rather prohibits sales below cost as unfair and deceptive. More recently, the West Virginia Supreme Court of Appeals held that West Virginia's Unfair Practices Act did not violate the antitrust provisions of the Sherman Act because, not only did it not fix prices, but the two acts had harmonious purposes, to "prohibit sales below cost for the purpose of injuring or *Page 167 
destroying competition." Hartsock-Flesher Candy v. WheelingWholesale, 328 S.E.2d 144, 156 (W.Va. 1984). It is worthwhile noting that Hartsock-Flesher also involved state exclusion of customary cash discounts in determining cost to cigarette wholesalers. In a similar vein, dealing with below cost milk sales, Tennessee's minimum markup law has been upheld. Walker v.Bruno's, Inc., 650 S.W.2d 357 (Tenn. 1983).
To some extent your first question takes for granted that section 100.30 is in violation of the Sherman Act, and therefore that it must pass the court-created test of exemption from application of the Sherman Act by virtue of being a clearly articulated, actively supervised state action. However,Hartsock-Flesher, Eau Claire Oil and other state and federal decisions indicate that unfair sales acts such as section100.30 do not violate the Sherman Act because they do not fix prices, and therefore the state action exemption question is superfluous. Baseline Liquors v. Circle K Corp.,630 P.2d 38, 45 (Ariz.App. 1981); cert. denied, 454 U.S. 969
(1981); Morgan v. Division of Liquor Control,664 F.2d 353, 355 (2d Cir. 1981).
You then ask whether section 100.30, as interpreted by proposed Wisconsin Administrative Code chapter Ag 119, is invalid under state and federal due process concepts since it excludes full consideration of actual cash discounts in determining cost. The answer is no.
I take your question to mean that since cash discounts are real and virtually uniform in the industry, disallowing them completely or partially to reduce cost is a regulatory scheme which is arbitrary and unreasonable.
Minimum markup statutes such as section 100.30 are unconstitutional "only if arbitrary, discriminatory, or demonstrably irrelevant to the policy" of the state. Nebbia v.New York, 291 U.S. 502, 538-39 (1934). Nebbia upheld a milk price statute as reasonably necessary to protect the public welfare. Wisconsin has followed this general rule, specifically upholding section 100.30 and indicating that the Legislature is entitled to embody economic and social issues through statutes designed to attack unfair marketplace practices. Ross, 259 Wis. at 379. Other courts have upheld statutes regulating unfair practices in cigarette sales. Corr-Williams Wholesale Co. v. Stacy WilliamsCo., 622 F. Supp. 156, 159 (S.D. Miss. E.D. 1985). Corr-Williams
also indicates that due process does not *Page 168 
even require the state to pick the least restrictive means for furthering the goal of market protection. Id. at 159, citingWilliamson v. Lee Optical of Oklahoma, 348 U.S. 483, 485-88
(1955). The court will not substitute its judgment for the Legislature's. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456
(1981).
Is section 100.30(2)(c)1. discriminatory with respect to how cash discounts are treated? Since wholesalers, distributors and multiple retailers are required to treat cash discounts in the same manner, it appears that absent further factual information the statute is not discriminatory. The fact situation described in your materials indicates that all resellers obtain the same discount. Those courts which have struck down unfair sales acts as discriminatory have done so because different categories of wholesalers had to treat cash discounts in opposite ways. Cohenv. Frey Son, 197 Md. 586, 80 A.2d 267 (1951); Serrer v.Cigarette Service Co., 74 N.E.2d 841 (Ohio 1946). In addition, the proposed administrative rules treat all categories of wholesalers the same in allowing cash discounts to be used to offset interest expenses and bank charges. If anything, the rules would soften the alleged statutory arbitrariness by at least permitting a portion of the cash discounts to be utilized to offset costs.
The essence of your due process query is the potential arbitrariness of disallowing full cash discounts to be used to reduce the wholesalers' cost of doing business. However, courts generally will approve of regulations which, although arguably not perfect, result in a cost figure using reasonable accounting methods. In the fact situation closest to the one you describe, where the West Virginia unfair sales act regulating cigarette resales set up a method for determining bona fide cost, which eliminated cash discounts, the court found no due process arbitrariness. Hartsock-Flesher Candy, 328 S.E.2d at 144, citing with approval Trade Commission v. Skaggs Drug Centers, Inc.,21 Utah 2d 431, 446 P.2d 958 (1968); Red Owl Stores, Inc. v. Com'rof Agriculture, 310 N.W.2d 99, 103 (Minn. 1981). Disallowing cash discounts while allowing other discounts for reducing the seller's cost is a recognized statutory distinction in other jurisdictions, based upon the concept that cash discounts relate to prompt payment and the cost of financing, whereas other discounts reduce the actual selling price of the item. E HWholesale, Inc. v. Glaser Bros., 158 Cal. App. 3d 728, 734,204 Cal. Rptr. 838 (1984). *Page 169 
Also, where there has been a proper delegation of rulemaking power, an administrative agency can interpret the details of cash or trade discount treatment in determining what is a below cost sale. The administrative agency's authority "is not price-fixing power, but essentially only power to prevent evasion under the guise of discounts." Dundalk Liquor Co. v. Tawes, 92 A.2d 560,566 (Ct.App.Md. 1953). The department has that proper delegation of authority in section 93.07(1).
Finally, with respect to the due process "arbitrariness" issue, a statutory scheme which prohibits below cost sales, requires a fixed cost of business minimum markup and also permits a showing of proof of a lesser cost than the statutorily fixed percentage has been held not arbitrary and a "reasonable means" of reaching the statutory goal. Baseline Liquors, 630 P.2d at 38.
The final question raised is whether the department has exceeded its statutory authority by proposing Wisconsin Administrative Code section Ag 119.08(3)(b) which would limit the full use of cash discounts in proving a "lesser cost of business" under section 100.30(2)(c)1.b. The answer is no. The statute itself disallows the use of cash discounts in order to reduce the cost of the merchandise to the wholesaler. The fact that an administrative rule largely recognizes that prohibition, by disallowing most of such cash discounts in determining a cost of doing business below three percent, would not support an assertion that statutory authority has been exceeded. The opposite assertion flows logically from the department's rulemaking proposal, that in fact the statutory disposition regarding cash discounts is, in large part, affirmed by the rule. If anything, the other side of this argument could be asserted in more logical fashion: that any permission by rule to use any portion of a cash discount to reduce the cost of doing business exceeds the statutory mandate that these discounts be disregarded.
However, the department's rule is based on the concept that the industry should have guidelines on how to establish proof of a lesser cost of doing business. The proposed rule is ostensibly for the purpose of setting down certain basic accounting principles by which the industry will not be able to circumvent the goal of the statute, and under which all similar wholesalers will operate using the same accounting structure. *Page 170 
Your concern relates to the fact that cash discounts are received by distributors, and that since section 100.30(2)(b) defines "cost" as "bona fide costs," there should be no reason why an actual cash discount should not be used to adjust the distributor's cost. This is not an issue relating to the department's proposed rule, since the disallowance of cash discounts is statutory. Nevertheless, your concern seems to be that since distributors are permitted by the statute to provide proof of a lesser cost of doing business than the statutory three percent, distributors should be allowed to use cash discounts to lower that cost of doing business, because they are bona fide
reductions. The proposed rules prevent such full use. The department's rationale for permitting deductions for cash discounts, to the extent that they offset interest expenses or bank charges, is that the statutory prohibition against using cash discounts is related only to the cost of the merchandise, not to the cost of doing business. Your question seems to accept this distinction since it asks whether the department can limit the use of the full cash discount in determining cost of doing business.
I do not believe that reliance upon the statutory language "bona fide costs" will further the claim of exceeding statutory authority. The term "bona fide costs" in section 100.30(2)(b) is used to clarify the terms "cost to retailer" and "cost to wholesaler," and the statute goes on to explicitly exclude cash discounts in determining "cost to retailer" and "cost to wholesaler." In other words, "bona fide costs" is used to clarify the meaning of cost of the merchandise. The term "bona fide costs" has also been held, in unfair sales act terminology, to mean "nonfraudulent," as opposed to the sense of being technically perfect. Baseline Liquors, 630 P.2d at 38. This concept of "bona fide costs" reinforces the basic notion that as long as the statutory and administrative scheme of determining a minimum markup is arguably reasonable, the fact that it may not be the perfect manner in which to calculate a price is not a basis for courts to substitute their judgment for that of the Legislature.
A prior opinion of the attorney general noted in discussing section 100.30(2) and trade discounts that a statutory nonrecognition of conditional promotional allowances is softened by permitting the seller to provide proof of a lesser cost. 72 Op. Att'y Gen. 126, 129 (1983). The fact that the department now is proposing rules to sellers for establishing proof of a lesser cost while preserving the overall statutory scheme of preventing below cost sales is *Page 171 
not inherently excessive, and the department's judgment regarding the details of such proof is to be given deference.
An earlier attorney general's opinion emphasized that in attempting to prove a lesser cost of business than the statutory minimum markup, the general requirements are that the seller use a "reasonable rate," "good faith," and "an acceptable system of accounting." 53 Op. Att'y Gen. 1, 6 (1964). The department, in proposed Wisconsin Administrative Code chapter Ag 119, is using its expertise to establish a reasonable, good faith, acceptable standard. There is no private statutory or constitutional interest which overrides the proposal.
I believe that the department's proposed rule on treatment of cash discounts is a constitutionally and statutorily permissible regulation of an accounting method, designed to ensure that the prohibition against unfair below cost sales is preserved.
DJH:MES:kdh *Page 172